# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO and UBS TRUST COMPANY OF PUERTO RICO,

**Plaintiffs,**

**v.**

XL SPECIALTY INSURANCE COMPANY, AXIS REINSURANCE COMPANY, and HARTFORD FIRE INSURANCE COMPANY,

**Defendants.**

**Civil No.** 15-3099 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court are defendants XL Specialty Insurance Company ("XL"), AXIS Reinsurance Company ("AXIS"), and Hartford Fire Insurance Company ("Hartford") (collectively, "insurers" or "defendants")'s and plaintiffs UBS Financial Services Incorporated of Puerto Rico ("UBS PR") and UBS Trust Company of Puerto Rico ("UBS Trust") (collectively, "UBS" or "plaintiffs")'s cross-motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 ("Rule 56"). (Docket Nos. 89, 94, 98.) For the reasons set forth below, the Court **GRANTS** defendants' motions (Docket Nos. 89 and 94.) Accordingly, plaintiffs' motion (Docket No. 98) is rendered moot.

## I.   Factual Background

In this breach of contract case, the parties dispute whether certain claims are covered by their insurance policies.  The Court provides facts underlying the various matters in controversy to ascertain the scope of the policies.  The following facts are deemed admitted by both parties pursuant to Local Rule 56.  Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vazquez, 603 F.3d 125, 130-31 (1st Cir. 2010).[1]

### A.   UBS and the Funds

UBS Trust is a trust company organized pursuant to the laws of the Commonwealth of Puerto Rico.  (Docket No. 37 at p. 2.) UBS Asset Managers, a division of UBS Trust, manages fourteen closed-end funds and co-manages nine additional closed-end funds with Banco Popular (collectively, "funds").  (Docket No. 89, Ex. 1 at p. 19.)  UBS Asset Managers is also an investment adviser for the funds.  Id. at pp. 28-29.

---

[1] Local Rule 56 governs the factual assertions made by both parties in the context of summary judgment.  Loc. Rule 56; Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007).  The Rule "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute."  CMI Capital Market Inv. v. Gonzalez-Toro, 520 F.3d 58, 62 (1st Cir. 2008).  The movant must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs."  Loc. Rule 56(b).  The nonmovant must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts."  Loc. Rule 56(c).  The movant may reply and admit, deny, or qualify the opponent's newly-stated facts in a separate statement and by reference to each numbered paragraph.  Loc. Rule 56(d).  Facts which are properly supported "shall be deemed admitted unless properly controverted."  Loc. Rule 56(e); P.R. Am. Ins. Co., 603 F.3d 125, 130 (1st Cir. 2010).

UBS PR is a subsidiary of UBS Financial Services Incorporated ("UBS Parent"). (Docket No. 89, Ex. 3 at p. 18.) UBS PR is a licensed broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and was an underwriter for the funds, as well as for bonds issued by various Puerto Rico government entities ("PR bonds"). (Docket No. 89, Ex. 1 at pp. 19-21, 25.) UBS PR sold shares of the funds to its brokerage customers. Id. at p. 20.

### B.    The Prior Matters

From 2009 through 2012, UBS was the subject of several civil and regulatory proceedings concerning the funds (collectively, "prior matters").

### 1.    2009 SEC Investigation and 2012 SEC Order

In August 2009, the SEC ordered an investigation of UBS PR to determine whether UBS PR violated United States securities laws ("2009 SEC investigation"). (Docket No. 89, Ex. 5.) On May 1, 2012, UBS PR settled with the SEC pursuant to an Order Instituting Administrative and Cease-and-Desist Proceedings ("2012 SEC order"). (Docket No. 89, Ex. 13.) The 2012 SEC order stated that UBS PR misrepresented the risks associated with the funds to customers "seeking stable, consistently-priced securities." Id. at p. 4. While "any secondary market sales [that] investors wanted to make depended

largely on UBS PR's ability to solicit additional customers or willingness to purchase shares into its inventory," UBS PR failed to inform investors that it "controlled the secondary market." Id. at p. 2.

The 2012 SEC order asserted that UBS PR

> knew investor demand [in the funds] was significantly declining relative to supply. For much of 2008, UBS PR purchased millions of dollars of [fund] shares into its own inventory while promoting the appearance of a liquid market with stable prices, without disclosing UBS PR's actions were propping up prices and liquidity.

Id. at p. 2. In sum, the order maintained that UBS PR misrepresented market forces by unilaterally setting prices at artificial levels and purchasing fund shares to disguise the lack of demand. Id. at pp. 4-6.

The 2012 SEC order also stated that in the spring of 2009, UBS Parent "directed UBS PR to substantially reduce its inventory of [fund] shares." Id. at p. 2. "To accomplish the reduction, UBS PR . . . executed a plan . . . in which UBS PR routinely offered and sold its [fund] shares at prices that undercut pending customer sell orders." Id. "During this period, numerous UBS PR customers were also attempting to sell their holdings but UBS PR's actions effectively prevented certain customers from selling their [fund] shares." Id. Moreover,

despite its own concerns about the funds, UBS PR persisted to "generate customer demand" for fund shares through promotions. Id. at p. 5.  Pursuant to the 2012 SEC order, UBS PR agreed to pay a total of $26,609,739.90 to settle the investigation.  (Docket No. 89, Ex. 13 at p. 12.)[2]

### 2.  **Union** Litigation

In February 2010, investors commenced an action against UBS in this Court, filing derivatively on behalf of four funds and directly as a putative class of fund investors.  Verified Shareholder Derivative Action and Class Action Complaint, Union de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico, No. 10-1141 (ADC) (D.P.R. March 31, 2011) (Docket No. 1.)  The investors alleged that UBS "manipulated the Funds and the bond market to the detriment of the Funds and its unsuspecting investors" by holding conflicting roles "as investment advisor, bond underwriter, and mutual fund manager" in the transactions.  Id. at p. 3.  The investors claimed that UBS made "material misstatements and fraudulent omissions concerning the nature, purpose, and suitability of the purchases of the [PR] Bonds for the Funds," saturating the funds with "[o]ver $750 million in purchases of the near-junk [PR] Bonds."  Id. at pp. 4-

---

[2] Specifically, UBS PR agreed to pay disgorgement of $11,500,000, prejudgment interest of $1,109,739.94, and a civil money penalty of $14,000,000.  (Docket No. 89, Ex. 13 at p. 12.)

5.  Additionally,  the  investors  specified  that  UBS  withheld material facts, including "that demand for the [PR] Bonds was falsely created by UBS Trust's massive purchases of the [PR] Bonds for the Funds" and "that the stated asset values published for the Funds were overstated, in large part due to the overvaluation of the [PR] Bonds." Id. at p. 22.

According to the investors, UBS "used the Funds as a  dumping  ground  for  the  toxic  [PR]  bonds"  and  "exacerbated [losses] for the Funds' investors as a result of the illiquidity of the market for the Funds, which is in large part controlled by [UBS], and by the fact that the Funds are highly leveraged." Id. at pp. 5-6, 21.  The investors claimed that UBS "controlled the buyers and the sellers (and collected fees from both of them)" and "deceiv[ed]  investors  as  to  how  other  market  participants  have valued a security, thereby sending false signals to the market." Id. at pp. 23-24.

## C.  The Policies

In 2011, UBS approached the defendants through a broker after  having  a  coverage  dispute  with  its  insurance  provider.

(Docket No. 89, Ex. 22 at p. 34.)[3]  XL was generally aware that

UBS was looking for a new provider due to the coverage dispute.

Id. at p. 34.  XL was also aware of the 2009 SEC investigation and

the Union action.  Id. at pp. 85-86, 165-66.  XL responded to UBS

with a price quote conditioned on UBS's acceptance of an attached

specific litigation exclusion.  (Docket No. 89, Ex. 28.)  The

exclusion was expansive, precluding coverage for

>  any Claim in connection with any proceeding
>  set forth below, or in connection with any
>  Claim based on, arising out of, directly or
>  indirectly resulting from, in consequence of,
>  or in any way involving any such proceeding or
>  any fact, circumstance or situation underlying
>  or alleged therein:
>
>  . . . .
>
>  Union de Empleados de Muelles de Puerto
>  Rico PRSSA Welfare Plan, et al. v. UBS
>  Financial Services Incorporated of Puerto
>  Rico, et al., Case No. 10-1141, U.S. District
>  Court, District of Puerto Rico.
>
>  The investigation by the Securities and
>  Exchange Commission captioned "in the Matter
>  of UBS (Certain Puerto Rico Bonds and Funds)"
>  SEC File No F-3491.

---

[3] Before purchasing liability insurance from the defendants, UBS was insured by
ACE Insurance Company of Puerto Rico ("ACE").  (Docket No. 89, Ex. 21 at p. 1.)
ACE provided UBS with a management liability insurance policy to insure claims
against the directors and officers of the funds.  Id.  In January 2012, UBS
resolved a coverage dispute with ACE for $7 million.  Id. at p. 2; Docket
No. 89, Ex. 20 at p. 37.  Through a settlement agreement, UBS relinquished the
coverage otherwise afforded by ACE for the prior matters and any claim related
to the prior matters.  (Docket No. 89, Ex. 21 at pp. 2-3.)

(Docket No. 89, Ex. 23 at p. 30.)  This exclusion was a "core part" of XL's insurance offer.  (Docket No. 89, Ex. 22 at p. 89.)  <u>See</u> <u>also</u> <u>id.</u> at pp. 72-73, 79-81, 85-97, 123-26, 138-45.  While UBS requested to change the language and narrow the provision, XL refused.  (Docket No. 89, Ex. 49 at p. 1.)  UBS agreed to proceed. <u>Id.</u>

UBS ultimately purchased liability coverage from XL, AXIS, and Hartford for the period of January 15, 2012 through January 15, 2014 ("policy period").  (Docket No. 89, Ex. 22 at pp. 32-33; Docket No. 89, Ex. 23 at p. 2.)[4]  XL issued the primary $10 million policy, AXIS issued a $5 million first excess policy, and Hartford issued a $5 million second excess policy (collectively, "policies").  (Docket No. 89, Exs. 23-25.)  The policies generally share the same terms and conditions, including the specific litigation exclusion.  (Docket No. 89, Ex. 20 at p. 29; Docket No. 89, Ex. 24 at p. 3; Docket No. 89, Ex. 25 at p. 6.)

### 1.    Terms and Conditions

The policies articulate various provisions limiting the scope of coverage, including the specific litigation exclusion.  <u>See, e.g.</u>, Docket No. 89, Ex. 23 at p. 30.  The policies

---

[4] The policy period was comprised of two distinct periods, each for one year: January 15, 2012 to January 15, 2013 and January 15, 2013 to January 15, 2014. (Docket No. 89, Ex. 22 at pp. 32-33; Docket No. 89, Ex. 23 at p. 2.)

also set forth definitions to eliminate ambiguity.  <u>See</u> Docket No. 89, Ex. 23.  As an overview, the policies provide "claims made coverage" for "Insureds [sic] Loss resulting from Claims first made against the Insureds during the Policy Period . . . for Wrongful Acts."  (Docket No. 89, Ex. 23 at p. 20.)  A "Claim" is "(1) any written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act; (2) any civil proceeding in a court of law or equity, or arbitration; or (3) any criminal proceeding which is commenced by the return of an indictment."  <u>Id.</u> at p. 14.  A "Claim" is also "any formal, civil, criminal, administrative, or regulatory investigation of an Insured" or "service of a subpoena upon an Insured in connection with a regulatory investigation of any Insured."  <u>Id.</u> at p. 35.  Additionally, "Wrongful Act" is "any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary duty or other duty committed by any Insured in the performance of, or failure to perform, Professional Services."  <u>Id.</u> at p. 20.  "Professional Services" means, in relevant part, "financial, economic or investment advice given or investment management services performed for others for a fee or commission by the Adviser or on behalf of the Adviser by any person or entity."  <u>Id.</u>

The policies also contain a notice of claim endorsement. (Docket No. 89, Ex. 23 at p. 41.) Pursuant to the notice endorsement, "[a]s a condition precedent to any right to payment under this Policy, the Insured shall give written notice to the Insurer of any Claim as soon as practicable after it is first made and the Risk Manager or General Counsel of the Insured first becomes aware of such Claim, but in no event later than ninety (90) days after the expiration of the Policy Period." <u>Id.</u> at p. 41. Moreover, the policies include an interrelated claims provision that stipulates, "All Claims arising from Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the same time at which the earliest such Claim is made." <u>Id.</u> at p. 17. "Interrelated Wrongful Acts" are "Wrongful Acts which are based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related series of related facts, circumstances, situations, transactions or events." <u>Id.</u> at p. 14.

### D.   The Disputed Matters

Since the beginning of the policy period on January 15, 2012, UBS has litigated two civil actions, two regulatory investigations, and hundreds of Financial Institutions Regulatory

Association ("FINRA") arbitrations (collectively, "disputed matters").

### 1. **Casasnovas** Litigation

In February 2014, shareholders in certain funds filed a derivative lawsuit against UBS in the Puerto Rico Court of First Instance, San Juan Superior Division. Complaint, Casasnovas-Balado v. UBS Fin. Servs., Inc., No. 2014-0072, 2015 WL 5179147 (P.R. Cir. Feb. 5, 2014) (Docket No. 1.) The shareholders claimed that UBS "mismanaged the UBS Funds" and "for years concealed from Plaintiffs and the general public their gross conflicts of interests." Id. at p. 6. According to the shareholders, UBS

> used the UBS Funds as a dumping ground for the PR Bonds they underwrote, thus creating a ready-made, captive market for that debt. In so doing, they improperly concentrated the assets of the Funds in PR Bonds that they themselves issued, rather than diversifying the Funds' assets across other debt and equity instruments.

Id. at p. 3.

The shareholders claimed that UBS also "engaged in a massive *ultra vires* scheme to manipulate the price for shares of the UBS Funds by discouraging investors from selling out of the UBS Funds, steering investors instead to borrow money which investors then used to purchase shares in the UBS Funds with loans

collateralized by shares of those very same Funds." Id. at p. 4.
This "Illicit Loan Scheme: (i) artificially increased the demand,
alleged market value, and liquidity of shares of the UBS Funds"
and "(ii) increased investors' market and credit risks associated
with investors' leveraged investments in shares of UBS Funds."
Id. at p. 23.  The shareholders asserted that investors are now
"trapped due to the illiquidity of the market created by the UBS
Defendants and the illegal margin loans they were encouraged to
take out by the UBS Defendants."  Id. at p. 5.

### 2.  __Fernandez__ Litigation

In May 2014, fund investors filed a putative class
action lawsuit against UBS in the United States District Court for
the Southern District of New York.  Complaint, Fernandez v. UBS
AG, No. 14-3252 (S.D.N.Y. May 5, 2014) (Docket No. 2.)  In May
2015, the investors filed their first amended complaint.  Amended
Class Action Complaint, Fernandez, 222 F. Supp. 3d 358 (S.D.N.Y.
May 8, 2015) (Docket No. 68.)  The investors alleged that UBS
"steered Class members, many of whom are older individuals focused
on generating income for retirement, to invest in the Funds, which
were high-risk, volatile investments that ultimately crashed,
losing Class members vast sums of money."  Id. at p. 1.  They
claimed that while UBS depicted the funds as "safe, secure"
securities, the "Funds were investments that posed serious risks"

because they were "highly leveraged" and "invested in hundreds of millions of dollars of debt securities issued by the Puerto Rico government, which . . . were especially risky." Id. at p. 2.

The investors asserted that UBS "acknowledged the riskiness of the Funds by secretly unloading a substantial portion of its own inventory of shares in the Funds on UBS's own clients." Id. at p. 26. They maintained that UBS Parent ordered UBS PR "to reduce the inventory of Fund shares that UBS owned," and UBS PR "sold 75% of its Fund share inventory to UBS clients" as a result. Id.

The investors continued that UBS engaged in "self-dealing transactions" by assuming "conflicting roles" and simultaneously "underwriting various municipal and other Puerto Rico bond offerings;" "selling the securities . . . into the Funds;" and "act[ing] as advisors to, and managers of, the Funds." Id. at pp. 27-29. The investors also claimed that UBS "adopted policies to incentivize and pressure [its] employees to push Class members to invest in the high-risk Funds," and "[e]ven when clients were already invested in the Funds, [UBS] pursued strategies to capture additional lucrative commissions on Fund shares." Id. at pp. 30 & 38. For example, UBS employed an "improper loan scheme by extending 'non-purpose' loans and lines of credit to Class members in order to increase investments in the Funds on margin—

thereby reaping even more inflated commissions on both the Funds and the loans while increasing Class members' exposure to risk." Id. at p. 5.

In June 2015, UBS moved to dismiss the Fernandez amended complaint. Memorandum of Law of the UBS Defendants in Support of Their Motion to Dismiss, Fernandez, 222 F. Supp. 3d 358 (S.D.N.Y. June 18, 2015) (Docket No. 91.) In support of their motion, UBS characterized the 2012 SEC order and the Union lawsuit as, respectively, "regarding the same alleged misconduct" and "making similar allegations" to the Fernandez amended complaint. Id. at pp. 15-17. UBS asserted that "notably, the Complaint here mimics allegations in [the Union] suit . . . sometimes word for word." Id. at p. 17 (internal citations omitted).

In December 2016, the district court granted in part and denied in part UBS's motion to dismiss. Fernandez, 222 F. Supp. 3d 358, 364 (S.D.N.Y. Dec. 7, 2016). The court found that "[t]he publicized lawsuits and administrative proceedings . . . [were] sufficient . . . to find that UBS investors had constructive notice and knowledge of their tort claims against UBS." Id. at 383. While the court acknowledged that sufficiently publicized lawsuits need only bring "allegations that are similar to some of the key allegations in the instant complaint" to trigger inquiry notice, the court ruled that "[h]ere, published reports of

legal proceedings and the proceedings themselves put plaintiffs on

notice of their *exact* allegations against the UBS Defendants."

Id. (emphasis added) (internal quotation marks omitted).

### 3.    2013 SEC Investigation and 2015 SEC Order

In October 2013, the SEC issued an order directing

the private investigation of UBS PR ("2013 SEC investigation").

(Docket No. 89, Ex. 36.)  The 2013 SEC investigation explicitly

mentioned the 2012 SEC order and asserted that UBS PR

> may have been or may be, among other things,
> making false statements of material fact or
> failing to disclose material facts to
> customers concerning, among other things, the
> risks or suitability of investing in mutual
> funds or [PR bonds] using margin, loans,
> provided by [a] UBS [affiliate], repurchase
> agreements or other means of credit.

Id. at pp. 1-2.  On September 29, 2015, UBS PR resolved the

investigation by consenting to an Order Instituting Administrative

Proceedings, in which UBS PR agreed to pay a total of $15,000,000

to the SEC ("2015 SEC order").  (Docket No. 89, Ex. 37.)[5]

According to the 2015 SEC order, from 2011 through

2013, a UBS PR representative "effected a scheme that resulted in

an increase to his compensation by soliciting certain customers to

use proceeds from [non-purpose lines of credit] to purchase

---

[5] Specifically, UBS agreed to pay disgorgement of $1,188,149.41, prejudgment
interest of $174,196.97, and a civil money penalty of $13,637,653.62. (Docket
No. 89, Ex. 37.)

additional shares in UBS PR [funds]." Id. at p. 2. The representative "offered and sold millions of dollars of [funds] to certain customers while soliciting them to use [non-purpose lines of credit] to purchase such securities and fraudulently misrepresenting the risks of this strategy to them." Id. at p. 3. The representative also "made material misrepresentations to these customers regarding the safety of this strategy" and "exposed customers—some of whom were listed . . . as being 'conservative' with regard to risk tolerance—to a greater risk than they otherwise would have been exposed." Id. at pp. 2 & 4. Although UBS PR "was responsible for supervising" the representative, UBS PR failed to supervise the representative reasonably and establish or implement reasonable procedures to prevent the representative's conduct, misstatements, and omissions. Id. at pp. 2 & 6.

### 4.  2015 FINRA Settlement

In February 2014, FINRA's Enforcement Department notified UBS PR that it was under investigation ("2014 FINRA investigation"). (Docket No. 89, Ex. 38.) On September 15, 2015, UBS PR submitted a Letter of Acceptance, Waiver and Consent to settle with FINRA ("2015 FINRA settlement letter"). (Docket No. 89, Ex. 40 at p. 6.) The 2015 FINRA settlement letter stated that

from January 1, 2009 through July 31, 2013 .
. . [UBS PR] failed to establish and maintain
a supervisory system and procedures reasonably
designed to ensure the suitability of
transactions in [funds] in certain
circumstances. Specifically, [UBS PR] failed
to monitor the combination of leverage and
concentration levels in customer accounts to
ensure that certain customers' transactions
were suitable in light of the customers' risk
objectives and profile.

Id. at p. 2.  As "relevant disciplinary history," the settlement

letter discussed the misconduct set forth in the 2012 SEC order.

Id.

       According to the settlement letter, "UBS PR

customer accounts were typically highly concentrated in [fund]

shares.  Highly concentrated customers bore increased risk," which

"was exacerbated by the fact that the [funds] were internally

leveraged."  Id. at p. 3.  UBS PR also "solicited certain customers

to open lines of credit [] offered by a UBS affiliate and

collateralized by the customers' securities accounts."  Id. at

p. 3.  The settlement letter asserted that "many customers who

needed to liquidate securities . . . . sold their [funds] into an

illiquid market at significant losses."  Id. at p. 6.  Pursuant to

the settlement letter, UBS agreed to pay a total of $18,478,402.

(Docket No. 89, Ex. 40 at p. 6.)[6]

---

[6] UBS agreed to pay a fine in the amount of $7,500,000 and restitution in the
amount of $10,978,402.  (Docket No. 89, Ex. 40 at p. 6.)

### 5.    FINRA Arbitrations

UBS notified XL of 55 FINRA arbitrations (collectively, "noticed FINRA arbitrations") and was served with approximately 1,150 additional proceedings (collectively, "additional FINRA proceedings").[7] (Docket No. 37 at pp. 4-5.) In the noticed FINRA arbitrations, fund investors alleged that the funds were unsuitable investments. See Docket No. 90, Exs. 13, 15-17, 22, 37-40, 49; Docket No. 91, Exs. 12-14, 24. Namely, the investors claimed that their investments were overconcentrated in highly leveraged, illiquid fund shares of high-risk PR bonds. See id. They asserted that UBS exposed investors to undue risk by controlling the secondary market for the funds and misled investors by artificially increasing demand and creating the appearance of liquidity. See id. Many of the claimants referred to the 2012 SEC order. See Docket No. 90, Exs. 13, 15-16, 22, 40, 49; Docket No. 91, Exs. 12-14, 24. According to UBS, the claimants in the additional FINRA proceedings "asserted claims substantively similar or identical to those asserted in the [noticed FINRA arbitrations]." (Docket No. 37 at p. 5.)

---

[7] The parties use 84 FINRA arbitrations as a sample set for this litigation. Docket No. 87 at p. 1; see also Docket No. 90, Exs. 2-51; Docket No. 91, Exs. 1-34. The Court's discussion of the noticed FINRA arbitrations and additional FINRA proceedings is limited to the arbitrations provided in the sample set. The sample set contains 14 noticed FINRA arbitrations and 70 additional FINRA proceedings. See Docket No. 89, Ex. 1 at pp. 41-42; Docket No. 90, Exs. 13, 15-17, 22, 37-40, 49; Docket No. 91, Exs. 12-14, 24.

        **E.    Coverage Communications**

        In October 2013, UBS Parent notified XL that it expected
UBS PR to be the subject of litigation and FINRA arbitrations
involving    allegations    that    "customers    were    unsuitably
overconcentrated in [the funds]; that UBS and its Financial
Advisors made unsuitable recommendations that customers use
leverage to purchase [the funds] or use [the funds] as collateral
for credit lines; and that UBS and its Financial Advisors made
misrepresentations regarding the risks associated with investing
in [the funds]." (Docket No. 89, Ex. 42 at p. 11.)

        On December 2, 2013, XL denied coverage to UBS PR for
the anticipated litigation and arbitrations. (Docket No. 98,
Ex. 23 at p. 3.) Citing the specific litigation exclusion, XL
maintained that "it appears that this Claim is based on, arises
out of, directly or indirectly results from, is in consequence of,
or otherwise involves the SEC and/or FINRA proceedings listed [in
the Specific Litigation Exclusion], or the facts, circumstances or
situations underlying or alleged therein." Id. XL concluded that
"no coverage is available under this Policy at this time." Id. at
p. 4.

        On December 13, 2013, UBS Parent informed XL that UBS
had been served with 23 FINRA arbitrations, noting that it had
previously provided XL with proper notice in October and that it

anticipated more arbitrations with similar allegations, as well as a subpoena from the SEC. (Docket No. 89, Ex. 42 at pp. 1-3.) UBS Parent notified XL of another 32 FINRA arbitrations, in addition to the SEC subpoena, on January 24, 2014. (Docket No. 89, Ex. 43 at pp. 2-5.) UBS Parent again indicated its anticipation of additional subpoenas and similar arbitrations, id. at p. 5, and on February 14, 2014, UBS Parent notified XL of the Casasnovas lawsuit. (Docket No. 89, Ex. 44.)

In March 2014, XL denied coverage to UBS PR for the FINRA arbitrations, 2013 SEC investigation, and Casasnovas litigation. (Docket No. 98, Ex. 24.) XL explained that the specific litigation exclusion precluded UBS from coverage for these claims. Id. at p. 5. AXIS sent UBS a similar denial of coverage for the FINRA arbitrations, 2013 SEC investigation, and Casasnovas action in May 2014. (Docket No. 98, Ex. 27.)

On May 14, 2014, UBS Parent informed XL of the Fernandez action. (Docket No. 89, Ex. 45.) Later that month, XL and AXIS each denied UBS's request for coverage pursuant to the specific litigation exclusion. (Docket No. 98, Ex. 25 at p. 4; Docket No. 98, Ex. 26; Docket No. 98, Ex. 28.) UBS did not notify XL of the 2014 FINRA investigation or additional FINRA proceedings before filing this case. (Docket No. 89, Ex. 1 at p. 46.)

## II.  Procedural History

UBS filed this breach of contract suit against the insurers on December 18, 2015.  (Docket No. 1.)  Both parties moved for summary judgment on July 28, 2017.  (Docket Nos. 89 & 98.)

## III.  Jurisdiction

The Court has jurisdiction over this civil action pursuant to 28 U.S.C. section 1332(a)(1) because the dispute is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332(a).

## IV.  Discussion

### A.  Standard of Review

A court will grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation."  Dunn v. Trs. of Bos. Univ., 761 F.3d 63, 68 (1st Cir. 2014) (internal citation omitted).

The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Tobin v. Fed. Exp. Corp., 775 F.3d 448, 450 (1st Cir. 2014) (internal citation

omitted).  The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with definite and competent evidence.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  The movant must identify "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'" which support its motion.  Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).

Once a properly supported motion has been presented, the burden shifts to the nonmovant "to demonstrate that a trier of fact reasonably could find in [its] favor."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).  "When the nonmovant bears the burden of proof on a particular issue, [he or] she [or it] can thwart summary judgment only by identifying competent evidence in the record sufficient to create a jury question."  Tobin, 775 F.3d at 450-51.  A court draws all reasonable inferences from the record in the light most favorable to the nonmovant, but it disregards unsupported and conclusory allegations.  McGrath v. Tavares, 757 F.3d 20, 25 (1st Cir. 2014).

When parties file cross-motions for summary judgment, a court must "consider each motion separately, drawing all

inferences in favor of each non-moving party in turn." <u>AJC Int'l,</u>
<u>Inc. v. Triple-S Propiedad</u>, 790 F.3d 1, 3 (1st Cir. 2015) (quoting

<u>D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co.</u>, 640 F.3d

27, 34 (1st Cir. 2011).  "Cross-motions for summary judgment do

not alter the summary judgment standard, but instead simply

'require [the Court] to determine whether either of the parties

deserves judgment as a matter of law on the facts that are not

disputed.'" <u>Wells Real Estate Inv. Tr. II, Inc. v. Chardon/Hato</u>

<u>Rey P'ship</u>, 615 F.3d 45, 51 (1st Cir. 2010) (quoting <u>Adria Int'l</u>

<u>Grp., Inc. v. Ferré Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001)).

### B.    Applicable Law

The Court applies Puerto Rico insurance law to this

diversity suit.  <u>See</u> <u>AJC Int'l</u>, 790 F.3d at 3-4.  The Puerto Rico

Insurance Code requires that "[e]very insurance contract [] be

construed according to the entirety of its terms and conditions as

set forth in the policy, and as amplified, extended, or modified

by any lawful rider, endorsement, or application attached to and

made a part of the policy."  <u>Id.</u> at 4 (alteration in original)

(citing P.R. Laws Ann., tit 26, § 101).  Insurance contracts

"should be generally understood within their most common and usual

meaning," and "[t]he insured who acquires a policy is entitled to

rely on the coverage offered to him when reading its clauses in

the light of the popular words used therein."  <u>AJC Int'l</u>, 790 F.3d

at 4 (quoting <u>Pagán-Caraballo v. Silva-Delgado</u>, 22 P.R. Offic. Trans. 96, 101 (1998)). Additionally, "exclusionary clauses are not favored, [and] should be strictly construed and in such a way that the policy's purpose of protecting the insured is met." <u>Id.</u> (alteration in original) (quoting <u>Pagán-Caraballo</u>, 22 P.R. Offic. Trans. at 101) (alterations in original).

Puerto Rico law does *not*, however, "compel constructions in favor of the insured when a clause favors the insurer, and its meaning and scope is [sic] clear and unambiguous." <u>AJC Int'l</u>, 790 F.3d at 4 (alteration in original) (quoting <u>Quiñones-López v. Manzano-Pozas</u>, 141 P.R. Dec. 139, 155 (1996)). "In such cases, it [i.e., the unambiguous clause] should be held as binding on the insured." <u>Id.</u> (alteration in original) (quoting <u>Quiñones-López</u>, 141 P.R. Dec. at 155). "If the wording of the contract is explicit and its language is clear, its terms and conditions are binding on the parties." <u>Nieves v. Intercontinental Life Ins. Co. of P.R.</u>, 964 F.2d 60, 63 (1st Cir. 1992).

**C. Defendants' Motion for Summary Judgment**

The insurers argue that UBS presents no genuine issue of material fact because the policies' interrelated claims provision and specific litigation exclusion preclude coverage for the disputed matters. (Docket No. 89 at p. 14.) Namely, the insurers contend that the disputed matters "'directly or indirectly result

from' or 'in any way involve' 'any fact, circumstance or situation'
alleged in or underlying the Prior Matters" and "'directly or
indirectly result from' or 'in any way involve' 'the same or
related or series of related facts, circumstances, situations,
transactions or events' as the Prior Matters." Id. (quoting the
policies). According to the insurers, the disputed matters "need
only *in any way involve any* fact, circumstance or situation" of
the prior matters to be barred from coverage. Id. at p. 15
(alteration in original).

The insurers state that the disputed matters involve
identical facts, circumstances, and situations as the prior
matters. See id. at p. 14. They assert that the disputed matters
"are rooted in, among other things, alleged conflicts of interest
because UBS . . . . allegedly manipulated the market for the Funds
for its own benefit and the detriment of Puerto Rico investors,
propping up the market for the Funds by convincing its unwitting
customers to purchase shares of the Funds." Id. at p. 17.

The insurers emphasize that the connection between the
prior and disputed matters "goes well beyond what the Policies
require because they share specific factual commonalities and
allegations." Id. Such "directly overlapping allegations"
include claims that: "UBS suffered from conflicts of interest;"
"UBS PR used the Funds as a 'dumping ground' for risky PR bonds to

generate fees;" "[t]he Funds lacked liquidity;" "UBS controlled the secondary market for Fund shares;" "[t]he Funds were over-concentrated in PR bonds;" "UBS PR allowed overconcentration in customer accounts and did not have systems for monitoring customer concentration in particular assets, including the Funds;" "[t]he Funds' use of leverage exacerbated investor losses;" and "UBS PR ordered financial advisors to market and sell Fund shares." <u>Id.</u> at pp. 18-19. The insurers also contend that the disputed matters directly address the 2012 SEC order and, significantly, that UBS articulated the shared factual bases between the prior and disputed matters before the court in <u>Fernandez</u>. <u>Id.</u> at pp. 19-20.

The Court agrees with the insurers that the disputed matters all involve facts, circumstances, or situations underlying the prior matters. Consequently, the specific litigation exclusion precludes coverage of the disputed matters.

## 1. The Specific Litigation Exclusion Precludes Coverage of the Disputed Matters

Because the policies are clear, the Court considers the plain language of the provisions as written. <u>See</u> <u>AJC Int'l</u>, 790 F.3d at 4. UBS maintains that Puerto Rico law requires insurance policies to be interpreted narrowly and "liberally in favor of the insured." <u>See</u> Docket No. 123 at p. 3 (quoting <u>López & Medina Corp. v. Marsh USA, Inc.</u>, 667 F.3d 58, 65 (1st Cir.

2012)).   A court should only apply such narrow construction,
however, when policy provisions are ambiguous.   <u>AJC Int'l</u>, 790
F.3d at 4.  Neither party contends that the policies are ambiguous.
<u>See</u> Docket No. 123 at p. 12 ("UBS does not dispute[] that the
Specific Litigation [Exclusion] is 'unambiguous.'").  Accordingly,
"the parties are bound by [the policies'] clearly stated terms and
conditions, with no room for further debate."   <u>López & Medina
Corp.</u>, 667 F.3d at 64.

          The plain language of the specific litigation
exclusion bars coverage for the disputed matters.  The exclusion
employs expansive language, denying coverage for "any Claim . . .
based on, arising out of, directly or indirectly resulting from,
in consequence of, or in any way involving [the prior matters] or
any fact, circumstance or situation underlying or alleged
therein." (Docket No. 89, Ex. 23 at p. 30.)  The disputed matters
all involve facts, circumstances, or situations alleged within the
2012 SEC order or <u>Union</u> proceeding, and many of the disputed
matters directly name or indirectly result from the 2012 SEC order.
That the disputed matters may also involve other allegations
unrelated to the prior matters is inapposite.   <u>Cf.</u> <u>Fed. Ins. Co.
v. Raytheon Co.</u>, 426 F.3d 491, 497 (1st Cir. 2005) (applying
Massachusetts law to an insurance exclusion and finding that
"substantial areas of non-overlap does not defeat the fact here

that there is substantial overlap between the two complaints").
The broad language of the bargained-for exclusion is also no reason
to deny enforcement of the unambiguous provision. Cf. Clark Sch.
for Creative Learning, Inc. v. Phila. Indem. Ins. Co., 734 F.3d
51, 55-57 (1st Cir. 2013) (applying Massachusetts law and holding
that a clear policy exclusion must be given its "plain literal
definition" even if the provision is broad).[8]

### i.  **Casasnovas** Overlap

The Casasnovas allegations involve many of the
exact facts, circumstances, and situations underlying the prior
matters.  Both the Casasnovas and Union plaintiffs, as well as the
2012 SEC order, assert that UBS held conflicting roles and
concealed its conflicts of interest from the plaintiffs.  See
Complaint, Casasnovas, No. 2014-0072, 2015 WL 5179147 (Docket
No. 1 at p. 6); Complaint, Union, No. 10-1141 (Docket No. 1 at
p. 3); Docket No. 89, Ex. 13 at p. 9.  The Casasnovas and Union

---

[8] In Clark, the First Circuit Court of Appeals enforced an insurance exclusion
similar to the exclusion in this case.  Clark, 734 F.3d at 55-57.  The Clark
court applied Massachusetts law to evaluate a policy exclusion that barred
losses "based upon, arising out of, directly or indirectly resulting from or in
consequence of, or in any way involving any matter, fact, or circumstances
disclosed in connection with Note 8 of the Financial Statement." Id. at 55.
Massachusetts law, like Puerto Rico law, requires insurance policy ambiguities
to be resolved in favor of the insured.  See id. at 55 (citing Allmerica Fin.
Corp. v. Certain Underwriters at Lloyd's, London, 449 Mass. 621, 628 (2007)
("To the extent the policy language is ambiguous, any ambiguities must be
construed in favor of the insured.")).  The court, nonetheless, enforced the
contract, holding that the exclusion was "both clear and broad in its language"
and that the court "must apply" the "plain literal definition" of the catchall
phrase, "or in any way involving." Id. at 55 & 57.

plaintiffs both claim that UBS used the funds as a "dumping ground" for PR bonds. See Complaint, Casasnovas, No. 2014-0072, 2015 WL 5179147 (Docket No. 1 at p. 3); Complaint, Union, No. 10-1141 (Docket No. 1 at p. 21). Like the Union plaintiffs, the Casasnovas plaintiffs allege that UBS improperly concentrated the funds with PR bonds. See Complaint, Casasnovas, No. 2014-0072, 2015 WL 5179147 (Docket No. 1 at p. 3); Complaint, Union, No. 10-1141 (Docket No. 1 at p. 4). The Casasnovas plaintiffs also maintain that investors were "trapped due to the illiquidity of the market created by the UBS Defendants," as revealed in the 2012 SEC order. See Casasnovas, No. 2014-0072, 2015 WL 5179147 (Docket No. 1 at p. 5); Docket No. 89, Ex. 13 at p. 2. Finally, the Casasnovas complaint maintains that UBS engaged in a scheme to promote customer demand for the funds, just as asserted in the 2012 SEC order. See Casasnovas, No. 2014-0072, 2015 WL 5179147 (Docket No. 1 at p. 4); Docket No. 89, Ex. 13 at p. 5.

## ii. **Fernandez** Overlap

The overlap between the factual allegations in Fernández and the prior matters has been recognized by UBS and the Fernández court. See Amended Class Action Complaint, Fernández, 222 F. Supp. 3d 358 (Docket No. 68); Memorandum of Law of the UBS Defendants, Fernández, 222 F. Supp. 3d 358 (Docket No. 91); Fernández, 222 F. Supp. 3d at 383. In support of their motion to

dismiss in _Fernández_, UBS argued that the 2012 SEC order "regard[ed] the same alleged misconduct" as the _Fernández_ amended complaint and that the _Union_ lawsuit "ma[de] similar allegations" to the _Fernández_ action. Memorandum of Law of the UBS Defendants, _Fernández_, 222 F. Supp. 3d 358 (Docket No. 91 at pp. 15-17). UBS stated that "notably, the Complaint here _mimics_ allegations in [the _Union_] suit . . . sometimes _word for word._" Id. at p. 17 (emphasis added) (internal citations omitted). The district court agreed with UBS's characterizations, finding that "the proceedings themselves put plaintiffs on notice of their _exact_ allegations against the UBS Defendants." Id. (emphasis added) (internal quotation marks omitted). Upon review of the factual allegations underlying _Fernández_, this Court agrees with UBS and the _Fernández_ court that extensive factual similarities exist between _Fernández_ and the prior matters.

### iii. 2013 SEC Investigation Overlap

The 2013 SEC investigation involves facts, circumstances, and situations underlying the 2012 SEC order. See Docket No. 89, Ex. 36. The 2013 SEC investigation expressly refers to the 2012 SEC order. Id. at p. 1. The investigation asserts that from at least 2010, UBS PR may have materially misrepresented to its customers "the risks or suitability of investing in mutual funds or [PR bonds]." Id. at p. 2. These allegations involve the

circumstances articulated in the 2012 SEC order: that UBS misrepresented the riskiness of the funds and PR bonds and failed to disclose material information to customers pertaining to the suitability of the funds and PR bonds as investments. See Docket No. 89, Ex. 13 at pp. 2 & 4.

The subsequent 2015 SEC order also involves facts, circumstances, and situations underlying the 2012 SEC order. The 2015 SEC order addresses the solicitation of UBS PR customers to purchase additional fund shares through non-purpose lines of credit, accompanied by the fraudulent misrepresentation of the risks of the investment strategy. (Docket No. 89, Ex. 37 at pp. 2-3.) The promotion of fund shares coupled with the material misrepresentation regarding the riskiness of the investment were circumstances discussed in the 2012 SEC order. See Docket No. 89, Ex. 13 at pp. 4-5. Additionally, both the 2012 and 2015 SEC orders state that UBS PR customers with low risk tolerance were subjected to a larger risk than that to which they would have otherwise been exposed. See Docket No. 89, Ex. 13 at p. 4; Docket No. 89, Ex. 37 at p. 4.

### iv. 2015 FINRA Settlement Overlap

The 2015 FINRA settlement letter involves facts, circumstances, and situations underlying the prior matters. See Docket No. 89, Ex. 40. The FINRA settlement letter alludes to

the 2012 SEC order and UBS's misconduct alleged in the order as "relevant disciplinary history." Id. at p. 2. Like the Union allegations, the settlement letter states that UBS PR failed to ensure the suitability of customers' transactions in the funds. See id. at p. 2; Complaint, Union, No. 10-1141 (Docket No. 1 at p. 5). Both the settlement letter and the 2012 SEC order identify that UBS did not respect customers' risk objectives. See Docket No. 89, Ex. 13 at p. 4; Docket No. 89, Ex. 40 at p. 2. Additionally, the settlement letter and the Union complaint assert that the funds were internally leveraged, which exacerbated customers' vulnerability. See Docket No. 89, Ex. 40 at p. 3; Complaint, Union, No. 10-1141 (Docket No. 1 at p. 6). Finally, like the Union complaint, the settlement letter laments that UBS customers needing to liquidate their investments were forced to sell fund shares into an illiquid market at significant losses. See Docket No. 89, Ex. 40 at pp. 5-6; Complaint, Union, No. 10-1141 (Docket No. 1 at pp. 5-6).

### v.    FINRA Arbitrations Overlap

The FINRA arbitrations involve facts, circumstances, and situations that overlap with the prior matters. The investors in the noticed FINRA arbitrations, like the Union plaintiffs, allege that the funds were unsuitable investments. See Docket No. 90, Exs. 13, 15-17, 22, 37-40, 49; Docket No. 91,

Exs. 12-14, 24; Complaint, <u>Union</u>, No. 10-1141 (Docket No. 1 at
p. 5).   The claimants in the <u>Union</u> action and noticed FINRA
arbitrations claim that their investments were overconcentrated in
highly leveraged, illiquid fund shares of high-risk PR bonds.  <u>See</u>
Docket No. 90, Exs. 13, 15-17, 22, 37-40, 49; Docket No. 91,
Exs. 12-14, 24; Complaint, <u>Union</u>, No. 10-1141 (Docket No. 1 at
pp. 4, 6, 21).   The noticed FINRA arbitrations, <u>Union</u> complaint,
and 2012 SEC order all assert that UBS controlled the secondary
market for the funds and misled investors by artificially
increasing demand and creating the appearance of liquidity,
thereby amplifying the investors' risk.  <u>See</u> Docket No. 89, Ex. 13
at pp. 2, 4-6; Docket No. 90, Exs. 13, 15-17, 22, 37-40, 49; Docket
No. 91, Exs. 12-14, 24; Complaint, <u>Union</u>, No. 10-1141 (Docket No. 1
at pp. 3, 23-25).   Many of the noticed FINRA arbitrations also
directly discuss the 2012 SEC order.  <u>See</u> Docket No. 90, Exs. 13,
15-16, 22, 40, 49; Docket No. 91, Exs. 12-14, 24.  With respect to
the additional FINRA proceedings, it is undisputed that the
claimants in those proceedings "assert[] claims substantively
similar or identical to those asserted in the [noticed FINRA
arbitrations]."  (Docket No. 37 at p. 5.)[9]

---

[9] The Court need not evaluate the facts underlying the additional FINRA
proceedings because UBS stipulates that the allegations are "substantively
similar or identical" to those asserted in the noticed FINRA arbitrations.
(Docket No. 37 at p. 5.)

## 2.    UBS's Counterarguments

Because UBS fails to identify competent evidence in the record sufficient to create a genuine issue of material fact, its counterarguments are unavailing.  See Tobin, 775 F.3d at 450-51.

### i.    Interpretation of "Claim"

The Court rejects UBS's argument that "even one covered claim in a complaint obligates Insurers to pay for its defense." (Docket No. 123 at p. 1.)  UBS argues that the insurers "have the burden of proving that every claim in every one of the 1,600-plus complaints comprising the Disputed Matters is subject to one or more of those exclusions" to succeed on summary judgment. Id. at p. 3.  UBS manipulates the word "claim," however, to suit its position.  The policies provide coverage for "claims," defined as "any civil proceeding[s] in a court of law or equity, or arbitration[s]" or "any formal, civil, criminal, administrative, or regulatory investigation[s] of an Insured."  (Docket No. 89, Ex. 23 at pp. 14 & 35.)  The policies do not afford coverage for specific issues, allegations, or causes of action within a complaint.

Puerto Rico law requires the Court to construe the contract according to the terms "as set forth in the policy." See AJC Int'l, 790 F.3d at 4 (citing P.R. Laws Ann., tit 26,

§ 101).  The Court therefore interprets the word "claim" as defined by the policies.  Cf. Raytheon, 426 F.3d at 497 (applying comparable Massachusetts legal standards to a similar policy definition of "claim" and finding that "[a] claim for present purposes is equivalent to a complaint").  Indeed, UBS concedes that the insurers' interpretation of the policies' definition of "claim" is correct.  See Docket No. 123 at p. 4 ("This is true for purposes of defining a 'Claim' under the Policy.").

UBS nevertheless contends that it is entitled to coverage for independent issues within an otherwise precluded complaint because of the district court decision in W Holding Co. v. AIG Ins. Co., No. 11-2271, 2014 WL 3378691 (D.P.R. July 9, 2014) (Gelpi, J.) (hereinafter, "W Holding II").  In W Holding II, unlike here, the parties debated the ambiguity of an insurance policy exclusion and the court was required to "resolve any doubts in the insured's favor."  Id. at *2 (citing W Holding Co. v. AIG Ins., 748 F.3d 377, 385-86 (1st Cir. 2014) (hereinafter, "W Holding I")).  The W Holding II policy was also narrower than the policies in this case.  The policy in W Holding II contained a notice provision that "require[d] the claims to be linked by 'facts alleged.'"  Id. at *4.  The court thus evaluated the facts alleged in the prior matter to determine whether there was "substantial overlap" with the "specific factual allegations" in the subsequent matters,

finding that only certain subsequent matters sufficiently overlapped. Id. at *5. The Court is unpersuaded by UBS's argument. The factual overlap between the prior and disputed matters in this case differs from the insufficient overlap discussed in W Holding II, and the exclusion in this case is far broader than the notice clause in W Holding II.

UBS's efforts to disaggregate the disputed matters belies its argument that the disputed matters are covered within the policy period. Only the 2013 SEC investigation and approximately 14 of the FINRA arbitrations in the sample set were made during the policy period.[10] The rest of the disputed matters, including Casasnovas, Fernández, the 2014 FINRA investigation, and approximately 70 of the 84 FINRA arbitrations provided in the sample set, were initiated after the policy period expired.[11] The latter disputed matters can only be considered within the policy period if they are interrelated wrongful acts pursuant to the interrelated claims provision. (Docket No. 89, Ex. 23 at p. 17.)

---

[10] The policy period concluded on January 15, 2014. (Docket No. 89, Ex. 23 at p. 2.) The 2013 SEC investigation began in October 2013. (Docket No. 89, Ex. 36.) Approximately 14 FINRA arbitrations in the sample set were initiated before January 15, 2014. (Docket No. 90, Exs. 13-17, 22, 24, 40, 46, 49-50; Docket No. 91, Exs. 12-14.)

[11] The Casanovas lawsuit and the 2014 FINRA investigation began in February 2014. Complaint, Casasnovas, No. 2014-0072, 2015 WL 5179147 (Docket No. 1); Docket No. 89, Ex. 38. Fernández was filed in May 2014. Complaint, Fernández, No. 14-3252 (Docket No. 2). Approximately 70 FINRA arbitrations of the sample set were initiated after January 15, 2014. See Docket No. 89, Ex. 1 at pp. 26-29.

The policies' interrelated claims provision provides, "All Claims arising from Interrelated Wrongful Acts shall be deemed to constitute a single Claim and shall be deemed to have been made at the *same time* at which the earliest such Claim is made."  Id. (emphasis added).  As the insurers note, "UBS cannot have it both ways: the Interrelated Claims provision cannot both aggregate the Disputed Matters to bring them into the 2013-14 Policy Period and simultaneously disaggregate the same Disputed Matters into thousands of claims to disconnect them from the Prior Matters" to avoid exclusion.  (Docket No. 131 at p. 1.)  The same broad construction of the policies necessary to bring the disputed matters within coverage also requires the Court to find that the disputed matters sufficiently overlap with the prior matters as to be barred by the exclusion.

### ii.  Duty to Defend Cases

The Court rejects UBS's arguments based on cases concerning "duty to defend" insurance policies because the "duty to defend" is not at issue in this case.  UBS argues that Puerto Rico law requires "insurers to establish that the allegations of a complaint, read liberally and with all doubts resolved in the insured's favor, do not create even a 'remote possibility' of coverage."  Docket No. 123 at p. 3 (quoting W Holding I, 748 F.3d at 384).  UBS conflates the applicable standard

for insurers' duty to defend, however, with the law governing the duty to indemnify.   See In re San Juan Dupont Plaza Hotel Fire Litig., 45 F.3d 564, 569 (1st Cir. 1995) (remanding the case because the court failed to "discuss the asserted distinctions between the duty to indemnify and a duty to defend"); Travelers Ins. Co. v. Waltham Indus. Labs. Corp., 883 F.2d 1092, 1100 (1st Cir. 1989) (faulting a party for failing to distinguish between the duty to defend and the duty to indemnify).   Because the insurers do not assume UBS's defense under any circumstances, Docket No. 89, Ex. 23 at pp. 15-16, the Court need not consider UBS's "duty to defend" arguments.

## V.   Conclusion

For the reasons set forth above, the defendants' motions for summary judgment are **GRANTED** (Docket Nos. 89 and 94) and plaintiffs' action is **DISMISSED WITH PREJUDICE**.   Judgment shall be entered accordingly.   Plaintiffs' motion for summary judgment (Docket No. 98) and all other pending motions are moot.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, February 1, 2018.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE